**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 27, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

DAVID WAYNE HEIDTKE,

      Plaintiff - Appellant,

v.

CORRECTIONS CORPORATION OF
AMERICA, JERE G. SUTTON, MD, in
his individual and official capacity, et al.,

      Defendants - Appellees.

No. 11-1205

_____

**ORDER**
_____

Before **BRISCOE**, Chief Judge, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.
_____

This matter is before the court on consideration of appellant's *Petition For Rehearing En Banc*. We also have a response from the appellee. In addition, via this order, we direct the clerk to withdraw our original panel decision *sua sponte*, and to issue the amended Order & Judgment and dissent attached to this order in its place.

The implicit request for panel rehearing found in appellant's petition is denied by a majority of the original panel. Chief Judge Mary Beck Briscoe would grant panel rehearing. The petition was also transmitted to all of the judges of the court who are in regular active service. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the en banc request is likewise denied.

As noted, however, we have determined *sua sponte* amendment of the original panel decision is in order. Consequently, the clerk is directed to withdraw the Order & Judgment issued originally on June 25, 2012. The amended decision attached to this order, along with the attached amended dissent, shall issue nunc pro tunc to the original filing date.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DAVID WAYNE HEIDTKE,

     Plaintiff-Appellant,

v.

CORRECTIONS CORPORATION OF
AMERICA, JERE SUTTON, MD, in
his individual and official capacity,
K. CARPENTER, RN, in her
individual and official capacity, and
ANNA JOLLY, RN, in her individual
and official capacity,

     Defendants-Appellees.

No. 11-1205

(D.C. No. 1:10-CV-00081-REB-MJW)
(D. Colo.)

## ORDER AND JUDGMENT[*]

Before **BRISCOE**, Chief Judge, **BALDOCK,** and **TYMKOVICH**, Circuit
Judges.

     Plaintiff David Wayne Heidtke, a former inmate at the Huerfano County

Correctional Center, fractured the distal radius of his right arm while playing softball

with other inmates.  For over seven weeks, Plaintiff experienced worsening pain and

swelling.  Eventually, a doctor at Denver Health Medical Center diagnosed Plaintiff

with a malunion of the fracture and Complex Regional Pain Syndrome (CRPS), a

---

[*] This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however,
for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

chronic pain condition. Plaintiff sued the prison's temporary treating physician, Dr. Jere Sutton, for deliberate indifference to his medical needs in violation of the Eighth Amendment.[1] The district court granted Defendant Sutton's motion for summary judgment, concluding he did not consciously disregard Plaintiff's medical needs.[2] Plaintiff appealed. We review a grant of summary judgment de novo, using the same standard as the district court. Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

I.

On June 2, 2008, the same day Plaintiff fractured his arm, a doctor at a local emergency room examined Plaintiff and determined the fracture was not serious. The doctor placed Plaintiff's arm in a splint and ordered Plaintiff to keep his arm elevated and ice packed for the first few days. The doctor told Plaintiff the injury would take three to eight weeks to heal. The emergency room doctor's discharge instructions stated Plaintiff should return to the emergency room if the splint did not prevent pain when he moved or if Plaintiff experienced unexpected, severe pain, numbness, discoloration, or swelling beyond the splint.

---

[1] The district court declined to exercise its supplemental jurisdiction over Plaintiff's state law claims. Plaintiff subsequently filed a state court action to address those claims.

[2] Plaintiff sued Corrections Corporation of America, which owns and operates Huerfano County Correctional Center. Plaintiff additionally sued Kathryn Carpenter and Anna Jolly, nurses at the prison. Plaintiff has voluntarily dismissed every Defendant except for Defendant Sutton.

Two days later, on June 4, Plaintiff had a follow up visit with Defendant Sutton at the prison medical clinic. Defendant ordered Plaintiff to return in five days for possible casting of the arm. At the June 4 appointment, Plaintiff, who had an upper bunk bed, asked Defendant to order a lower bunk restriction so he would not have to climb into the upper bed without a ladder. On June 6, 7, and 10, Plaintiff went to the medical clinic, complaining of pain and swelling. On each of these occasions, Plaintiff did not wear his sling. The nurse on duty told him to wear his sling at each of these visits. Again, on June 13, Plaintiff returned to the clinic without wearing his sling. He requested to have his arm re-wrapped, and complained of continued pain and swelling. Plaintiff saw Defendant for the second time on June 16 or 17. Defendant determined he could not cast the arm because of the continued swelling. Defendant ordered an x-ray of the arm and a follow up visit in two weeks. Defendant's reading of the x-ray did not reveal a malunion of the fracture. Subsequent to this visit, Plaintiff filed grievances, complaining of the increasing pain and swelling.

The next month, on July 2, Plaintiff saw a nurse because of continuing pain. He complained not only of worsening pain and swelling, but also of the loss of almost all mobility in his thumb, increased tingling and numbing sensations in his fingers, and pain from his thumb to his elbow. The nurse rewrapped the bandage covering the splint. Plaintiff returned to the medical clinic on July 5. Another nurse documented Plaintiff's complaints of pain, rewrapped his bandage, and gave him a

3

prescription for Acetaminophen.  Plaintiff took the initial dose of medicine, but failed to obtain the remainder of the doses.  Two days later, on July 7, Plaintiff saw Defendant for the third time.  Defendant noted the swelling, but stated the hand and fingers had good color and warmth.  Defendant rewrapped the bandage, ordered an additional x-ray, and prescribed Naprosyn for the pain.  Defendant's temporary, interim duty with the prison ended the following day.  The new prison physician saw Plaintiff seven and a half weeks after the injury and referred Plaintiff to an orthopedic surgeon, who in turn referred Plaintiff to a neurologist.  Doctors then diagnosed Plaintiff with carpal tunnel syndrome and CRPS.

In his complaint, Plaintiff alleged Defendant was deliberately indifferent to his medical needs because Defendant knew: (1) Plaintiff needed to return to the hospital based on the emergency room doctor's discharge instructions;(2) Plaintiff needed to be assigned a lower bunk and did not order such a restriction; (3) leaving a broken arm splinted rather than casted posed a substantial risk of serious injury; and (4) Plaintiff should return to the hospital if he experienced pain and swelling, yet, rather than fulfill his gatekeeper role, he re-wrapped the splint.  Additionally, Plaintiff alleged Defendant refused to fulfill his gatekeeper role and failed to provide oversight to the medical staff; specifically, he knew that the nurses did not schedule follow up appointments and that the nurses rewrapped Plaintiff's splint without following nursing protocols, filling out records, and without fulfilling their gatekeeper roles.

4

The district court granted Defendant's motion for summary judgment. The district court analyzed his Eighth Amendment claim pursuant to the two-prong test the Supreme Court set forth in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). This test requires the deprivation of care to be objectively sufficiently serious and the official to be subjectively aware of the risk. The district court held Plaintiff's radial fracture was sufficiently serious to meet the objective prong of the test. But as to the subjective prong, the court concluded nothing in the record supported an inference Defendant possessed the required culpable subjective mental state for deliberate indifference. The court noted Defendant and the nurses saw Plaintiff eight times over a one month period for his complaints. The court looked to evidence that Defendant examined Plaintiff two days after the injury, 13 days later, and 28 days after that. The district court stated even though, arguably, Defendant could have been more thorough and comprehensive, the medical staff noted and addressed Plaintiff's complaints at each visit. The district court stated:

> All of plaintiff's various complaints about the care he received from Dr. Sutton—whether he fully appreciated the seriousness of plaintiff's fracture and the potential for the development of CRPS; whether the arm should have been casted and who was qualified to make that determination; whether the swelling and other symptoms plaintiff experienced were consistent with his injury or suggested a more serious complication; the scheduling and timeliness of follow up appointments; the failure to order a lower bunk restriction—at best suggest nothing more than the erroneous exercise of medical judgment regarding the seriousness of plaintiff's condition. This is not a case where the necessity for a different or more aggressive course of medical treatment was so obvious that a lay person could have perceived it.

5

Heidtke v. Corrections Corp. of Am., 2011 WL 1335855, *5 (D. Colo. Apr. 7, 2011). The district court concluded it could not second-guess Defendant's medical judgment under the guise of an Eighth Amendment claim. The court further concluded no evidence suggested Defendant was deliberately indifferent in not ordering a referral. On appeal, Plaintiff contends disputed issues of material fact exist from which we could infer Defendant knew of a substantial risk of serious harm but failed to take reasonable measures to abate the risk.

## II.

A district judge may properly grant a motion for summary judgment where "no genuine issue as to any material fact" exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c). In an Eighth Amendment deliberate indifference case, "we look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006). Plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." Id. (quoting Sealock, 218 F.3d at 1209). If, after a review of the record, we determine no genuine issue of material fact was in dispute, "we determine whether the substantive law was applied correctly." Sealock, 218 F.3d at 1209.

Prison officials "violate the Eighth Amendment's ban on cruel and unusual

6

punishment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.'" Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To prevail on a § 1983 claim, "'inadvertent failure to provide adequate medical care' is not enough, nor does 'a complaint that a physician has been negligent in diagnosing or treating a medical condition . . . state a valid claim of medical mistreatment under the Eighth Amendment.'" Id. (quoting Estelle, 429 U.S. at 105). "Rather, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Id. (quoting Estelle, 429 U.S. at 106). We conduct a two-pronged inquiry, composed of an objective and subjective component. Id. (citing Farmer v. Brennan, 511 U.S. 825 (1994)). "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." Id. (citing Farmer, 511 U.S. at 834). Under the subjective inquiry, "the prison official must have a 'sufficiently culpable state of mind.'" Id. at 1231 (citing Farmer, 511 U.S. at 834).

### A.

As mentioned above, the district court concluded Plaintiff's "radial fracture was sufficiently serious to meet the objective prong of the test." Heidtke, 2011 WL 1335855, *3. On appeal, Plaintiff contends the district court erred in identifying the injury as a radial fracture rather than *complications* from a radial fracture. *For purposes of this appeal*, we will assume, without deciding, Plaintiff's fracture and

7

complications from the fracture are sufficiently serious to satisfy the objective inquiry. We turn then to the subjective inquiry. A prison official cannot be liable for a claim of deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Self, 439 F.3d at 1231 (internal quotation marks omitted). "The subjective component is akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." Id. (internal quotation marks omitted). And "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Id. (internal quotation marks omitted). A serious medical need's obviousness "could be evidence of deliberate indifference, although a prison official may show that the obvious escaped him and avoid liability." Id. (internal quotation marks omitted).

In this Circuit, we have recognized two types of conduct which may rise to the level of deliberate indifference in a prison medical case: "(1) a medical professional failing to treat a serious medical condition properly; and (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating an inmate's condition." Id. But, our case law firmly establishes that "the subjective component is not satisfied, absent an extraordinary

8

degree of neglect, where a doctor merely exercises his considered medical judgment." Id. at 1232. Examples of such matters "that traditionally fall within the scope of medical judgment are decisions *as whether to consult a specialist* or undertake additional medical testing." Id. (emphasis added). A prison doctor does not violate the Eighth Amendment's prohibition on cruel and unusual punishment when he "simply resolves the question whether additional diagnostic techniques or forms of treatment is indicated." Id. (quoting Estelle, 429 U.S. at 107) (internal quotation marks omitted). An Eighth Amendment deliberate indifference claim "is therefore actionable *only in cases where the need for additional treatment or referral to a medical specialist is obvious*." Id. (emphasis added). "And obviousness in the circumstances of a missed diagnosis or delayed referral, while not subject to a precise formulation, requires direct or circumstantial evidence that can arise in several different contexts." Id. We have identified three. First, a doctor may recognize an inability to treat a patient because of the seriousness of the medical condition and a lack of expertise, but decline or unnecessarily delay a referral. Id. Second, a doctor may fail to treat a medical condition "so obvious that even a layman would recognize the condition." Id. Finally, a doctor could completely deny care even though he observes recognizable symptoms which could signal a medical emergency. Id.

If a prison physician "responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard." Id. "*But where a*

9

*doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law*." Id. at 1232–33 (emphasis added). Accordingly, in this Circuit, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." Id. at 1233 (internal quotation marks omitted). As long as the prison physician "provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." Id. Indeed, we have limited our subjective inquiry "to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, *not to the ultimate treatment necessary*." Id. (emphasis added).

## B.

Plaintiff *has not* meet the subjective prong. In the present case, Plaintiff, like the prisoner in Self, attempts to remove the subjective inquiry from the deliberate indifference test by suggesting "that a competent doctor looking at [his] symptoms would have known that [malunion and CRPS, in our case, were] possible and taken additional steps to confirm such a diagnosis."[3] Id. As we discussed in Self, "Farmer

---

[3] Despite Plaintiff's concerns that the district court erred in its subjective component analysis because it identified the fracture itself as the injury for the objective inquiry, the district court clearly did analyze the *complications* that resulted from the treatment of the fracture in its subjective prong analysis. The district court did not examine the Eighth Amendment claim as if Defendant had

(continued...)

10

v. Brennan and our cases interpreting Farmer have made clear, 'a purely objective test for deliberate indifference is simply incompatible' with the tenets of the Eighth Amendment." Id. (quoting Farmer, 511 U.S. at 839). Thus, Plaintiff "must point to some evidence allowing an inference [Defendant Sutton] consciously disregarded the possibility of [complications from the distal radius fracture]." Id.

Plaintiff posits five such inferences. Defendant knew of the hospital discharge instructions in his prison medical chart directing Plaintiff to return to the hospital if severe pain or swelling beyond the splint occurred. Defendant observed and documented Plaintiff's worsening symptoms and Defendant failed to refer Plaintiff to a specialist. Additionally, Defendant knew the obviousness of the need for treatment because the new prison physician noted "obvious" deformity and pain two weeks later and Defendant took measures to rewrap the bandage and prescribe pain medications as Plaintiff's symptoms progressively worsened.

Taking the facts of the case in the light most favorable to Plaintiff, the facts

---

[3](...continued)
somehow caused the fracture. Indeed, the district court analyzed Defendant's *treatment* of the fracture, acknowledging the issues of whether Defendant fully appreciated the seriousness of Plaintiff's fracture and the potential for the development of CRPS; whether the arm should have been casted and who was qualified to make that determination; whether the swelling and other symptoms plaintiff experienced were consistent with his injury or suggested a more serious complication; and the failure to order a lower bunk restriction. Heidtke, 2011 WL 1335855 at *5.

11

do not show *conscious disregard* of Plaintiff's medical needs.[4]  As discussed above,

an Eighth Amendment deliberate indifference claim is actionable only where the

need for a referral or additional treatment is obvious.  Self, 439 F.3d at 1232.  And

obviousness in the circumstances of a missed diagnosis or delayed referral arises in

three contexts.  Id.  Obviousness first may be found where a medical professional

completely denies care.  But that certainly is not the case here, where Defendant

Sutton examined Plaintiff on three occasions, ordered x-rays, prescribed medication,

and monitored Plaintiff's condition.  Rather, Plaintiff contends Defendant missed the

diagnosis of malunion and CRPS and did not refer him to a specialist.

1.

We accordingly turn to the second scenario from which we may find

obviousness.  This occurs where a medical professional fails to treat a medical

condition "so obvious that even a layman would recognize the condition." Self, 439

---

[4] Plaintiff argues the district court acknowledged disputed issues of material fact existed and summary judgment was therefore improper.  Although Plaintiff is correct the district court acknowledged genuine issues of fact exist, as do we—whether Defendant fully appreciated the seriousness of the fracture and the potential for development of CRPS, whether the arm should have been casted, whether Plaintiff's swelling and pain were consistent with his injury or suggested a more serious complication, the scheduling and timeliness of appoints, and the failure to order a lower bunk restriction—Plaintiff confuses the summary judgment standard. The district court *viewed each of these facts in Plaintiff's favor*, as do we, and concluded the facts suggested nothing more than the erroneous exercise of medical judgment regarding the seriousness of Plaintiff's condition.  In other words, we give Plaintiff the benefit of the doubt these facts *are* true and consider them in his favor. But still, Plaintiff cannot succeed in showing a conscious disregard to satisfy the subjective prong.

12

F.3d at 1232. Plaintiff believes the district court erred in applying this standard. The Farmer court stated the risk is obvious if a "reasonable man" would realize it. Farmer, 511 U.S. at 842. Plaintiff argues under our precedent, a physician, rather than a lay person with no medical training should serve as our measure of a reasonable man. Plaintiff cites Department of Labor v. Occupational Safety and Health Review Commission, 938 F.2d 1116 (10th Cir. 1991), in support of his position. But that case is not an Eighth Amendment deliberate indifference case. Rather, Plaintiff ignores our decision in Self, in which we clearly stated that obviousness arises where the condition is so obvious *even a layman* would recognize the condition. Self, 439 F.3d at 1232. Indeed, this situation arose in Oxendine v. Kaplan, 241 F.3d 1272, 1279 (10th Cir. 2001), where a prison doctor treated a severed finger, but missed diagnosing the onset of gangrene. Id. The facts in that case easily satisfied the subjective component for the purposes of defeating summary judgment. Like in our case, the inmate informed the physician his finger was not healing. Id. And although the doctor recognized and noted the inmate's repaired tissue appeared black and was disintegrating, he ignored the symptoms. Id.

But unlike the medical condition in Oxendine, the malunion and onset of CRPS in this case were not so obvious that even a layman would recognize the conditions. A misdiagnosis, even if malpractice, is insufficient to satisfy the subjective component. But Plaintiff does not view Defendant's missed diagnosis of CRPS as a misdiagnosis. As stated by Jonathan Woodcock, one of Plaintiff's

13

experts, "[t]his case is rather typical in that the problem was not one of misdiagnosis. The problem was a failure to recognize that Mr. Heidkte's [sic] early signs and symptoms put him at high risk for the development of CRPS, and that early interventional treatment which could have impacted his course was not undertaken." Aplt. App. vol. II, 443. Accordingly, this situation is more akin to a treating physician's "failure to connect-the-dots," which, by itself, "is insufficient to establish a culpable state of mind." Self, 439 F.3d at 1235. "Only when the symptoms obviously point to a substantial risk of harm can we draw an inference of the medical professional's conscious disregard of an inmate's medical emergency." Id. As Plaintiff's expert admits, Defendant failed to recognize the early signs and symptoms which put him at risk for CRPS.

Defendant's failure to recognize the early signs and symptoms highlights the flaw in Plaintiff's argument—Defendant lacked knowledge of the complications from the fracture. Plaintiff argues the Supreme Court's standard for the subjective prong is whether a physician "abates the risk" of a medical condition and the district court erred by not explaining how Defendant's actions "were reasonable measures to abate the risk of complications of a fracture." In making this argument, Plaintiff gets ahead of himself. Before a physician can abate a risk, he must *know* of that risk.[5]

---

[5] Plaintiff asserts the district court "has set up an impossible catch 22 where a prisoner must be 'seen' to establish knowledge of a risk, but the very act of being seen defeats the prisoner's claim." Plaintiff is incorrect. The key is not the number

(continued...)

14

As stated above, we may find obviousness where a "medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition." Self, 439 F.3d at 1232. We do not suggest as a matter of law that medical obviousness is generally to be viewed from the perspective of a layman. Obviously at times a doctor may be reckless by failing to detect what should be glaringly obvious to any medical professional—though not to a layperson. We cannot infer recklessness in this case under either situation. The presence of swelling and pain, even weeks after fracturing an arm, would not evidence a medical urgency so unmistakable that it would have been apparent to a layman or glaringly obvious to a medical professional. Defendant noted in Plaintiff's chart that, despite the pain and swelling, Plaintiff's fingers and hand had good color and warmth. Aplt. App. vol. I, 169. Moreover, Defendant ordered x-rays, scheduled follow up appointments with Plaintiff, and prescribed Plaintiff medication.[6] Dr. Woodcock

_____

[5](...continued)
of times a doctor sees a patient, but instead whether the doctor examines the patient and treats his symptoms. In arguing Defendant's treatment methods failed to abate a substantial risk, Plaintiff disregards whether Defendant even had knowledge of a substantial risk. Instead, Plaintiff argues the second prong should be simply another objective prong, based on what a competent physician *should* know, instead of what the doctor at issue actually knew when treating the patient. In other words, Plaintiff must show more than that a risk merely existed. Rather, Plaintiff must show Defendant *consciously disregarded* Plaintiff's condition, amounting to deliberate indifference.

[6] Defendant viewed the x-ray of Plaintiff's wrist and noted, on June 17, 2008, that the wrist appeared stable and slightly impacted *with no angulation*. Aplt. App. vol. I, 241. According to Defendant's reading of the x-ray, the malunion had not
(continued...)

15

stated "[t]he standard of care is to treat the *symptoms* which may *develop* into CRPS as early as possible in order to obtain a better outcome." Aplt. App. vol. II, 443. The question of whether Defendant Sutton should have been aware CRPS *could* develop relates to the standard of care Defendant owed Plaintiff. Perhaps Defendant's conduct constituted malpractice. But Plaintiff has a separate state law action against Defendant for that cause of action. As in the past, we *refuse* to constitutionalize a medical malpractice claim. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Plaintiff cannot show that complications from the radial fracture were so unmistakable that even a layman would apprehend it or that it would have been so glaringly obvious to a medical professional that recklessness may be inferred. As mentioned above, the subjective prong of the deliberate indifference prong is exactly that—subjective. Plaintiff must show a *conscious disregard* on the part of Defendant, which Plaintiff simply cannot do.

2.

We turn now to the third and final scenario in which we may find obviousness.

---

[6](...continued)
occurred as of that visit. Plaintiff's expert, W. Carlton Reckling, stated he did not believe the x-rays taken on June 17, 2008 demonstrate "an acceptably aligned fracture." Id. at vol. II, 344. Even if Defendant misread the x-ray, at worst, Defendant committed malpractice. Defendant treated Plaintiff and was not deliberately indifferent, though he may have been negligent. Defendant next saw Plaintiff on July 7, when he ordered another x-ray. Id. at vol. I, 244. Defendant ended his employment with the prison the following day.

16

No evidence exists in the record to show Defendant may have recognized an inability to treat Plaintiff because of the seriousness of the medical condition and a lack of expertise, but declined or unnecessarily delayed a referral to an orthopedic surgeon. Self, 439 F.3d at 1232. "[A]bsent an extraordinary degree of neglect," where a doctor exercises his considered medical judgment not to consult a specialist, the plaintiff cannot satisfy the subjective component.[7] Id. Dr. Woodcock stated Defendant "ignored [Plaintiff's] worsening symptoms, making no effort to diagnose or refer him for further specialty evaluation for over seven weeks." Aplt. App. vol. II, 448. Dr. Woodcock believes Defendant "should have been more concerned about preventing CRPS than in waiting to confirm its diagnosis." Id. at 446. This evidence does not establish Plaintiff's symptoms "obviously required unusual medical skill or ability thus necessitating referral, or that [Defendant Sutton] otherwise failed to provide a course of treatment consistent with the symptoms he recognized." Self, 439 F.3d at 1235. Rather, Defendant "provide[d] a level of care consistent with the symptoms presented by the inmate." Id. at 1233. Because no evidence of actual knowledge or recklessness exists, "the requisite state of mind cannot be met." Id.

---

[7] Plaintiff argues this language is dicta, but we disagree. Self restated the law of Eighth Amendment deliberate indifference in the Tenth Circuit. We may not disregard our case law in which we have interpreted the subjective prong of the Farmer test. Furthermore, Plaintiff's contention that Self is inconsistent with Farmer is simply untrue. The district court correctly applied this Circuit's case law in its decision and *did not* establish a standard inconsistent with that of Farmer.

3.

Finally, Plaintiff asserts Defendant was deliberately indifferent to his medical needs by failing in his "gatekeeper" role. But this type of deliberate indifference is rare. Sealock, 218 F.3d at 1211. Where the physician "knows that his role in a particular medical emergency is *solely* to serve as a gatekeeper for other medical personnel capable of treating the condition, . . . he may be liable for deliberate indifference." Id. (emphasis added). Here, Defendant Sutton was Plaintiff's treating physician. Although Defendant stated he would need a neurologist to rule out CRPS, a general practitioner is not deliberately indifferent by failing to make a referral when he has no knowledge of a substantial risk.[8] Such a result, absent an extraordinary degree of neglect, would be inconsistent with our case law that a doctor's decision to consult a specialist is a medical judgment, which does not satisfy the subjective component. Self, 439 F.3d at 1232.

In this case, a reasonable jury could not infer conscious disregard either from Defendant's missed diagnosis or Defendant's failure to refer Plaintiff to a specialist. Although Defendant's medical judgment may have constituted malpractice or negligence, we would simply speculate to conclude Defendant had a culpable state of mind. Because summary judgment requires evidence rather than speculation that

---

[8] Defendant acted in the capacity of a general practitioner at the prison. Although he had been an orthopedic surgeon in the past, he stopped practicing as an orthopedic surgeon in 1988.

Defendant knew about and consciously disregarded the risk, the decision of the district court is AFFIRMED.[9]

Entered for the Court,

Bobby R. Baldock
United States Circuit Judge

---

[9] On March 20, 2012, Plaintiff filed a "motion to strike factually false, ex-parte letter and for reprimand." On March 21, 2012, Plaintiff filed an "unopposed motion to withdraw motion to strike factually false, ex-parte letter and for reprimand." Plaintiff's March 21 unopposed motion to withdraw is granted.

11-1205, Heidtke v. Corrections Corp. of America, et al.

**BRISCOE**, Chief Judge, dissenting.

I respectfully dissent in this summary judgment case. I disagree with the majority's conclusion that Heidtke failed to present sufficient evidence to satisfy the subjective component of the Farmer test, i.e., whether Sutton had a sufficiently culpable state of mind, Farmer v. Brennan, 511 U.S. 825, 834 (1994). Although it is a close question, in my view the evidence presented by Heidtke in response to Sutton's motion for summary judgment was sufficient to create an issue of material fact regarding whether Sutton knew about and disregarded a substantial risk of serious harm to Heidtke. Accordingly, I would reverse the district court's grant of summary judgment in favor of Sutton and remand the case to the district court for further proceedings.

I

Although the majority opinion provides a brief factual summary of Heidtke's interactions with Sutton, it fails, in my view, to do so in a manner consistent with the standard of review that applies in summary judgment cases. More specifically, I believe that the majority opinion fails to recount the evidence in the light most favorable to Heidtke. Accordingly, I shall begin by doing so.

On June 2, 2008, Heidtke was an inmate at the Huerfano County Correctional Facility (HCCF) in Walsenburg, Colorado. App. at 217. On that date, Heidtke "[i]njured [his] right wrist playing softball." Id. at 353. Heidtke was initially escorted to HCCF's medical unit, and then transported to the

emergency department at Spanish Peaks Regional Health Center in Walsenburg. Id. at 21. There, his right arm and wrist were x-rayed. Id. The x-ray revealed a "[m]inimally displaced transverse fracture [of the] distal right radius," with a "[f]racture line [that] m[ight] extend to the radiocarpal joint, dorsal medially." Id. at 544. Dr. Rodney Lange, the emergency room physician who examined Heidtke, treated the injury by placing Heidtke's right arm and wrist in a splint and sling. Id. at 21, 217. Lange also issued orders directing that Heidtke's injured arm be elevated and packed in ice for the first few days after injury. Id. at 21. Lange opined the fracture would take three to eight weeks to heal. Id.

Defendant Jere Sutton is a physician licensed to practice medicine in Colorado. Id. at 218. Sutton practiced as an orthopedic surgeon until he elected, in 1988, to cease his surgical practice. Id. Thereafter, he practiced office orthopedics, including various stints as a temporary physician. Id. at 232. On May 30, 2008, Sutton contracted with CCA to work as a temporary general medical doctor at HCCF until a permanent replacement could be hired. Id. at 218, 486.

On June 4, 2008, two days after his injury, Heidtke was seen by Sutton in HCCF's medical unit. Id. Sutton noted that there was "swe[l]ling of the hand and pain on palpation and movement." Id. at 240. Sutton entered orders that the arm, which at the time was bound on a splint and in a sling, was to be considered for casting after the swelling decreased. Id. Sutton also ordered that Heidtke

2

receive Vicodin for pain, and ordered that a follow-up visit occur within "5 days for possible casting." Id.

On June 6, 2008, when Heidtke appeared at HCCF's medical unit to pick up his medication, he was noted to be out of his sling, with his arm dangling. Id. at 219. Heidtke was seen again in the medical unit the following day, June 7, 2008. Id. His hand was still swollen and he was given Tylenol for ongoing pain. Id. Three days later, on June 10, 2008, Heidtke returned to the medical unit and discussed with staff members the possibility of obtaining a "pass" that would allow him to wear his sling during trips to the mess hall. Id.

Heidtke was seen by Sutton for a second time on June 17, 2008 (approximately fifteen days after the injury). Id. at 241. Sutton observed that the "[f]ingers and hand on the [injured arm] [we]re edematous - have good color and wrmth [sic]." Id. An x-ray of Heidtke's arm was taken and Sutton observed from the x-ray that the fracture "[a]ppear[ed] stable and slightly impacted with no angulation." Id. Sutton noted, however, that Heidtke "complain[ed] of swelling and pain" and had been "[u]nable to sleep due to the pain." Id. Sutton further noted that Heidtke "[h]a[d] been out of [his] sling at times." Id. Sutton determined he could not cast the arm "at th[at] time due to the swelling," and he "[d]iscussed [with Heidtke] means of improving and lessening the swelling." Id. Sutton prescribed extra-strength Tylenol and a four-day-regimen of Vicodin and directed Heidtke to return for a follow-up visit in two weeks. Id.

3

Following his visit with Sutton on June 17, 2008, Heidtke completed and submitted to HCCF officials an inmate grievance form. Therein, Heidtke complained that the medical staff at HCCF had ignored his complaints of swelling and pain, and were deliberately indifferent to his medical needs. Id. at 474. The grievance was denied. Id.

On June 24, 2008, Heidtke completed and submitted to HCCF officials a written "REQUEST FOR SERVICE" form stating, "I realize that I finished my meds on the 22nd of this month, but the pain and swelling is still persisting, it is getting worse instead of better, if possible I would like to be seen again before my next scheduled x-ray." Id. at 357. On that same date, a nurse in HCCF's medical unit responded in writing, "You are scheduled to talk to the doctor." Id.

On July 2, 2008, Heidtke completed and submitted another 'REQUEST FOR SERVICE" form, this time stating:

> I would like to be seen by the Doctor for my broken wrist. For 4 weeks I have been experiencing worsening pain and swelling in my hand/arm. I have lost almost all mobility in my thumb. I'm getting more and more tingling and numbing sensations in my 4 fingers, the pain that radiates from my thumb to my elbow is starting to border on excruciating. My thumb is terribly painful to the touch.

Id. at 358. Heidtke was seen later that same day by a nurse on duty in HCCF's medical unit. Id. at 242. The nurse noted that the "[s]kin on [the] fingers [of Heidtke's right hand were] very tight and puffy." Id. Heidtke advised her that "his fingers tingl[e]d much of the time," and that he was "[u]nable to move [his]

4

thumb and fingers without pain." Id. The nurse "rewrapped" Heidtke's arm with an "ACE wrap" and noted her observations in Heidtke's medical records. Id.

Heidtke returned to the medical unit on July 5, 2008, complaining of arm and wrist pain. Id. at 243. The nurse who saw Heidtke observed that the splint and sling were in place on his right arm. Id. The nurse provided Heidtke with a five-day regimen of acetaminophen and noted that he was scheduled to be seen by a physician later that week. Id.

On July 7, 2008, Heidtke was seen by Sutton for a third time. Id. at 244. Heidtke advised Sutton that he was experiencing swelling and pain in his right thumb and was unable to move it. Id. Sutton observed that Heidtke's right hand and fingers "[we]re slightly swollen," but had "[g]ood color and [we]re warm." Id. Sutton "[r]emoved [the] outer ace wrap and reapplied [it] and allowed it to be less tight at [the] base of [the] thumb." Id. Sutton also directed that Heidtke receive an x-ray of his right wrist, and he prescribed Heidtke a twenty-day regimen of Naprosyn for his pain. Id.

Following his appointment with Sutton on July 7, 2008, Heidtke completed and submitted to HCCF officials an inmate grievance form. The form stated, in pertinent part, "The medical staff is aware of my worsening condition, yet they do nothing but change the bandage on my arm and take me off the only medication that was allotted." Id. at 475. Heidtke alleged that these acts constituted deliberate indifference. On July 9, 2008, HCCF officials wrote that "[t]here [wa]s

5

no evidence to support [his] claim [of] insufficient treatment." Id.

Approximately two weeks later, on July 22, 2008, Heidtke was seen in HCCF's medical unit by a different physician, Dr. David Paz, who had been hired by CCA as a full-time employee and effective replacement for Sutton. Id. at 245, 414. Paz noted that Heidtke was "7 ½ weeks post fall" and fracture and was "[s]till [experiencing] severe pain and inability due to pain to extend his thumb." Id. at 245. Paz removed Heidtke's splint and observed a "deformed dorsum of [Heidtke's] right hand." Id. Paz also observed "[g]ood pulses and neuro intact." Id. Paz noted that "[p]ain in [Heidtke's] snuff box [was] obvious,"[1] and that Heidtke was also experiencing "pain [in his] right elbow." Id. Paz noted in Heidtke's medical chart: "Need to rule out scaphoid fracture and fracture or dislocation of elbow and carpal bones. Ortho consult important and needed!" Id. Accordingly, Paz ordered an "[o]rthopedic consult ASAP," as well as an "X-Ray (outside of this facility if necessary within next couple of days right hand, wrist, scaphoid view of wrist and right elbow for fracture/dislocation[)]." Id. Paz also prescribed Heidtke pain medication "until [he was able to] see[] ortho surgeon." Id.

Heidtke was examined by an orthopedic physician, Dr. Shawn Nakamura,

---

[1] "The anatomical snuffbox is a triangular deepening on the radial, dorsal aspect of the hand—at the level of the carpal bones, specifically, the scaphoid and trapezium bones forming the floor. The name originates from the use of this surface for placing and then sniffing powdered tobacco, or 'snuff.'" Wikipedia, Snuff Box, at http://en.wikipedia.org/wiki/Anatomical_snuff_box.

6

on August 28, 2008. Id. at 24, 363. Nakamura noted that Heidtke had decreased range-of-motion "in all planes of the [right] wrist," decreased "dorsiflexion, "[r]adial and ulnar deviation," "[p]ain with [range of motion] of the thumb," and "[t]enderness throughout the wrist and hand." Id. at 363. Nakamura concluded that Heidtke had suffered a right distal radius fracture, and "ha[d] elements of RSD," id., i.e., Reflex Sympathetic Dystrophy (otherwise known as Complex Regional Pain Syndrome (CRPS)), id. at 346.[2] Nakamura stated in his medical notes, "I'm . . . getting a referral to Neurology and getting an MRI of the R[ight] wrist. Worried about tenderness to palpation of the snuff box." Id.

In early 2009, Heidtke was seen by a neurologist, Dr. Sunku, who concluded, after running various tests, "that the results . . . [we]re consistent with moderate carpal tunnel syndrome and that [Heidtke] possibly also had" RSD. Id. at 457. Later in 2009, after Heidtke was paroled to a halfway house and was responsible for his own medical care, "he was definitively diagnosed with RSD by

_____

[2] CRPS "is a chronic pain syndrome most often resulting from trauma to a single extremity." Oldham v. Astrue, 509 F.3d 1254, 1255 n.1 (10th Cir. 2007) (internal quotation marks omitted). "The most common acute clinical manifestations [of CRPS] include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone." Id. "[T]he degree of pain reported is [characteristically] out of proportion to the severity of the injury sustained," and, "[w]hen left untreated, the signs and symptoms of the disorder may worsen over time." Id. Notably, "[a] diagnosis of RSD is based upon complaints of persistent, intense pain that results in impaired mobility of the affected region, coupled with other complaints . . . ." Id. (internal quotation marks omitted).

7

a neurologist" at Denver Health Medical Center.  Id. at 26.  Heidtke was also seen by Dr. Timothy Muratore, an orthopedic doctor at the Denver Health Medical Center.  Muratore made the following recommendations after examining Heidtke in late 2009:

> At this point, due to the patient's complex regional pain syndrome, he is unlikely to benefit from any surgical intervention at this point. In fact, he will most likely have worsening of the CRPS if there were to be any surgery performed in the near future.  For that reason, we feel that the best course of action for the patient is to be sent to the pain clinic or anesthesiologist for potential sympathetic blockade of his right upper extremity.  If we are able to obtain better control of the CRPS, he may be a candidate for wrist arthroscopy for diagnosis as well as debridement.  However, at this point, the CRPS is uncontrolled and any surgery would cause a flare.

Id. at 365.

## II

The majority opinion also fails, in my view, to recognize and give proper weight to the expert evidence presented by Heidtke in response to Sutton's motion for summary judgment.  That evidence, which Heidtke attached to his response to the other defendants' motion for summary judgment and then incorporated by reference in his response to Sutton's motion for summary judgment, provided as follows:

• Dr. Carlton Reckling.  Reckling, an orthopedic surgeon retained by Heidtke as an expert witness, considered the steps taken by Sutton during each of his three visits with Heidtke.  With respect to the June 4, 2008 visit, Reckling

opined that Sutton failed to provide Heidtke with even the "minimal accepted treatment," which Reckling described as a referral to an orthopedic surgeon for evaluation and possible surgery, and a follow-up evaluation by Sutton within five days. Id. at 436. Reckling further opined that Heidtke's "clinical presentation" at the June 17, 2008 visit "[wa]s not 'normal' for a simple distal radius fracture," and that the proper course of treatment was "referral to an orthopedic surgeon for evaluation and possible surgery. Id. As for the July 7, 2008 visit, Reckling opined that Sutton failed to provide Heidtke with the "minimal accepted treatment," which Reckling described as the removal of Heidtke's splint and the evaluation of Heidtke's wrist and hand, new x-rays taken and compared to the first two sets of x-rays, evaluation of the x-rays by an orthopedic surgeon, and application of a "[n]ew well padded and well molded splint." Id. at 437. "In summary," Reckling opined that "when . . . Sutton saw . . . Heidtke on June 17 and on July 7, 2008, he should have known that there was a problem that required evaluation by an orthopedic surgeon, and he either should have acted in that capacity or referred . . . Heidtke to an orthopedic surgeon for treatment." Id. at 438. According to Reckling, "Sutton's treatment of . . . Heidtke's fracture was the equivalent of no treatment." Id.

• Dr. Jonathan Woodcock. Woodcock, a neurologist retained by Heidtke as an expert witness, opined that it was well-accepted that "the key symptom" of CRPS was "continuous, intense pain out of proportion to the severity of the

9

injury, which gets worse rather than better over time," id. at 441 (internal quotation marks omitted), and he noted that "[w]ithin two weeks of . . . Heidtke's fracture on 6/2/08, he was exhibiting this symptom coupled with edema, another key symptom" of CRPS, id., "both of which worsened over time," id. Woodcock further opined that "[w]henever this occurs following peripheral injury, particularly a radial fracture, the pain must be investigated thoroughly and steps taken to ensure that CRPS does not develop." Id. "In other words," he opined, "early, persistent, severe pain must be taken seriously . . . because . . . without early intervention[] it may develop into CRPS." Id. (emphasis in original).

Woodcock noted that in this case "Heidtke's early symptoms of severe pain and swelling were worsening when they would have been expected to be improving," id. at 446, yet "Sutton left . . . Heidtke in a sugar tong splint," id. at 445-46, for "seven weeks," id. at 445, causing "his fracture [to] heal[] in a malunion and his CRPS [to] worsen[]," id. at 446. And, Woodcock opined, "[h]ad . . . Heidtke been referred to an orthopedic surgeon within at most several weeks of the time it had become clear that his recovery course was considerably atypical, it is more likely than not he would have received appropriate, and surely more aggressive treatment, and that he would have experienced either a considerably more benign course or a full recovery." Id. Woodcock effectively agreed with Reckling by opining that "[i]n the absence of [a] referral" to an orthopedic surgeon for evaluation, "Heidtke did not receive treatment for his

10

developing CRPS under . . . Sutton's care." Id. at 447.

• Dr. Lynn Sander. Sander, a board certified internist retained by Heidtke, opined that "Heidtke's complaints were consistent with known complications of a radial fracture which include fracture of the scaphoid bone, disabling arthritis, carpal tunnel syndrome, radial shortening and angulation deformity which limit range of motion, chronic pain, non-union and reflex sympathetic dystrophy (RSD)." Id. at 454. She further opined that "Sutton's lack of treatment" in light of these symptoms "was especially egregious because he knew of the risk of serious complications of radial fracture by virtue of his [orthopedic] training, yet he did not take any action to mitigate the risk on multiple occasions." Id. Like Heidtke's other two experts, Sander opined that, "[i]n essence," Heidtke "received no medical treatment for his injury for 7.5 weeks until there was a change in providers." Id.

## III

Construing all of this evidence in the light most favorable to Heidtke, I am persuaded that reasonable jurors could have found that Sutton was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." Farmer, 511 U.S. at 837. In particular, Sutton (a) reviewed the medical records and x-rays from Heidtke's visit to the Spanish Peaks emergency room, which clearly suggested the possibility of a complex fracture extending into Heidtke's wrist joint, (b) reviewed Heidtke's medical records at HCCF, which

11

included notations of Heidtke's complaints to the nursing staff of increasing pain, swelling, and lack of mobility in his right wrist and hand, (c) personally met with and evaluated Heidtke on three occasions during June and July 2008, during which he not only observed Heidtke's wrist and hand, but also heard directly from Heidtke regarding his symptoms, and (d) obtained and reviewed an additional x-ray of Heidtke's wrist and hand on June 17, 2008. In short, Sutton was well aware that, following Heidtke's initial injury, Heidtke's symptoms continued to worsen, rather than improve.

In turn, I am persuaded that the evidence, again construed in the light most favorable to Heidtke, was sufficient to allow a jury to reasonably find that "the need for additional treatment or referral to a medical specialist," i.e., an orthopedic surgeon, was "obvious." Self v. Crum, 439 F.3d 1227, 1232 (10th Cir. 2006). All three of Heidtke's expert witnesses testified that Heidtke's steadily worsening pain and swelling established an obvious and urgent need for Heidtke to be referred for evaluation and possible surgery by an orthopedic surgeon, yet Sutton not only failed to do so, but effectively did nothing to address Heidtke's symptoms over the course of three visits spanning seven-and-a-half weeks.[3]

---

[3] Had Sutton not seen Heidtke on the last occasion, my determination may have been different. In other words, I am not persuaded that a jury could reasonably find that Sutton was deliberately indifferent based solely on the steps he took with Sutton during the first and second appointments on June 4 and 17, 2008. But, in my view, it is particularly egregious that, at time of the third appointment on July 7, 2008, when Heidtke's symptoms were clearly worsening rather than improving,

(continued...)

12

Based upon this expert witness testimony, a jury could reasonably find that Sutton, in effect, completely denied care to Heidtke, at least at the time of the third and final appointment on July 7, 2008. See id. at 1232 (noting that obviousness can arise where a medical professional completely denies care in the face of recognizable and serious symptoms). Alternatively, a jury could reasonably find that Heidtke's steadily worsening symptoms were so "glaringly obvious to a medical professional that recklessness may be inferred," Maj. Op. at 16. In other words, a jury could reasonably find, based upon the evidence presented by Heidtke, that Sutton exhibited "an extraordinary degree of neglect" by failing to refer Heidtke to an outside specialist for evaluation and possible treatment, particularly by the time of the third appointment on July 7, 2008. Self, 439 F.3d at 1232. Thus, in my view, a jury could reasonably find that Sutton satisfied the subjective component of the Farmer test.

In concluding that Heidtke failed to present sufficient evidence of obviousness, the majority focuses most of its attention on the question of whether "the malunion and onset of CRPS in this case were . . . so obvious that even a layman would recognize the conditions." Maj. Op. at 13. But Heidtke has never relied on this "obvious to a layman" standard. Instead, he argues that, under the circumstances of this case, the proper "measure of a reasonable man" is a trained

_____

[3](...continued)
Sutton continued to take no serious steps to either determine the precise cause of the problem, or to alleviate Heidtke's symptoms.

"physician, rather than a lay person with no medical training." Id. Although the majority concedes that "at times a doctor may be reckless by failing to detect what should be glaringly obvious to any medical professional," id. at 15, it summarily concludes, without any mention of Heidtke's expert witness testimony, that Heidtke cannot prevail even under this standard. As I have explained, however, all three of Heidtke's expert witnesses agreed that, based upon the symptoms presented by Heidtke and clearly observed by Sutton, the need for referral to a specialist or additional treatment would have been obvious to any medical professional. In light of this unusually strong expert witness testimony, I believe it is quite clear that Heidtke presented sufficient evidence to survive Sutton's motion for summary judgment, and that the district court erred in concluding otherwise.