**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 6 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HORACE OXENDINE,

      Plaintiff-Appellant,

v.

BARRY R.G. KAPLAN, M.D. and
JOSE A. NEGRON,

      Defendants-Appellees.

No. 00-1310

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 99-M-1224)**

---

Submitted on the briefs:*

Horace Oxendine, Pro Se.

Thomas L. Strickland, United States Attorney, and Martha A. Paluch, Assistant
United States Attorney, Denver, Colorado, for Defendants-Appellees.

---

Before **SEYMOUR, EBEL** and **BRISCOE**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

    * After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case therefore is ordered
submitted without oral argument.

Plaintiff-Appellant Horace Oxendine ("Oxendine") filed a lawsuit pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), on June 30, 1999, alleging that health care professionals (and various others who were later dismissed from the lawsuit[1]) at the Federal Correctional Institute ("FCI") in Florence, Colorado, provided him with inadequate and delayed medical care during the course of his incarceration. The district court dismissed Oxendine's complaint for failure to state a claim on which relief could be granted, see Fed. R. Civ. P. 12(b)(6), and we REVERSE.

**BACKGROUND**

In his complaint, Oxendine alleged that Defendants Dr. Barry Kaplan, M.D., the prison physician, and Jose Negron, an assistant to Dr. Kaplan, were not qualified to perform an emergency re-attachment of Oxendine's right, middle-finger fingertip[2] after it was accidentally severed when it was caught in Oxendine's cell door. Despite their lack of qualification, alleged Oxendine,

---

[1] The other defendants to this action, A. Hererra, C. Lamb, D. Livingston, J. Brown, and M. Azumah, were dismissed from the lawsuit on September 14, 1999, by order of the district court.

[2] It is not clear from Oxendine's complaint how much of his finger was severed, but the medical charts attached to his complaint refer to Oxendine's "Skin, Nail, Nail Bed, 1/2 Terminal Phalanx" and describe the reattachment procedure as "remodle [sic] Bone, Full Thickness Skin, Nail Bed, & reimplantation of Full Thick Skin."

Defendants refused to obtain outside specialized medical assistance both before performing the surgery and after Oxendine's injury exhibited signs of significant worsening in the weeks following the surgery. Oxendine alleged that Defendants' delay caused the permanent loss of a portion of his finger. Oxendine alleged that these actions of the Defendants violated his Fifth and Fourteenth Amendment rights to due process, and his Eighth Amendment right to be free of cruel and unusual punishment.[3]

After Oxendine twice amended his complaint pursuant to orders of the district court, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim on which relief can be granted.

On July 24, 2000, the district court granted Defendants' motion to dismiss. The district court found that Oxendine "had failed to state a claim within the jurisdiction of the court," because the Defendants' conduct, as described by Oxendine in his second amended complaint, "does not rise to a level of a claim of

---

[3] Although Oxendine has not exhausted any administrative remedies regarding these claims, they were allowed to proceed because he was seeking money damages only in his Bivens action. See Garrett v. Hawk, 127 F.3d 1263, 1267 (10th Cir. 1997) ("Congress has to date failed to provide any administrative remedies that must or even could be exhausted before a Bivens suit may be brought by prisoners against prison officials. While Congress easily can amend this oversight, until an administrative remedy is provided for Bivens claims for monetary damages, we must conclude that no exhaustion of administrative remedies is required . . . .").

a violation of [Oxendine's] constitutionally protected rights." The district court

found that Oxendine had not alleged deliberate indifference by the Defendants, as

required to support a <u>Bivens</u> action, and had instead alleged facts that, at most,

constituted negligence, which is not cognizable under <u>Bivens</u>.[4]

Oxendine filed a timely notice of appeal of the district court's decision, and

now argues that the district court improperly concluded that Defendants' conduct

did not rise to the level of a constitutional violation.[5]

## STANDARD OF REVIEW

We have stated that "[d]ismissal of a pro se complaint for failure to state a

claim is proper only where it is obvious that the plaintiff cannot prevail on the

---

[4] The district court noted that negligence claims against government agents are not cognizable under <u>Bivens,</u> but may only be brought against the federal government itself under the Federal Tort Claims Act ("FTCA"). The United States is the only proper defendant in an FTCA action. <u>See</u> <u>United States v. Smith,</u> 499 U.S. 160, 167 n.9 (1991); <u>Allgeier v. United States,</u> 909 F.2d 869, 871 (6th Cir. 1990). Oxendine's complaint thus cannot be construed as having been brought under the FTCA. Regardless, Oxendine maintains that his claim should be viewed as a <u>Bivens</u> claim rather than a FTCA claim.

[5] In his second amended complaint, Oxendine also asserted that he had been subjected to retaliation as a result of his filing the instant lawsuit. The district court did not address Oxendine's retaliation claims in its Order dismissing the complaint. Oxendine does not challenge the dismissal of his retaliation claim anywhere in his opening brief, however, and instead challenges only the district court's ruling that Defendants' conduct did not result in a violation of Oxendine's constitutional rights. We therefore deem the retaliation issue waived and decline to address it on appeal. <u>See</u> <u>Harris v. Champion</u>, 51 F.3d 901, 905 (10th Cir. 1995).

- 4 -

facts he has alleged and it would be futile to give him an opportunity to amend." Perkins v. Kansas Dep't of Corrections, 165 F.3d 803, 806 (10th Cir. 1999). In addition, "we must liberally construe the allegations of a pro se complaint." Id. Finally, we note that, in deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may look both to the complaint itself and to any documents attached as exhibits to the complaint. See Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"); Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.")

## DISCUSSION

Reviewing the district court's decision to dismiss Oxendine's complaint for failure to state a claim de novo, see Sutton v. Utah State School for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999), we find that Oxendine's complaint presents facts which, if true, could entitle him to relief under Bivens. We must therefore reverse the district court's judgment dismissing Oxendine's complaint for failure to state a claim.

Although Oxendine references the Due Process Clauses of the Fifth and Fourteen Amendments and argues that he was denied his "due process rights to

adequate medical treatment," his complaint is more accurately characterized as an Eighth Amendment claim that Defendants' provision of inadequate medical treatment, and delay in obtaining specialized medical assistance when it was clear Oxendine's injury was worsening despite their efforts on his behalf, caused Oxendine substantial harm.[6]

As the Supreme Court of the United States has noted, prisoners have an Eighth Amendment right to adequate medical care:

> [E]lementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency . . . .

Estelle v. Gamble, 429 U.S. 97, 103 (1976). In keeping with the principle that government officials are generally afforded wide latitude when fulfilling their

---

[6] The Due Process Clause of the Fourteenth Amendment "prohibits any State from depriving a person of life, liberty, or property without due process of law." See Meachum v. Fano, 427 U.S. 215, 223 (1976). "The Due Process Clause standing alone offers prisoners only a 'narrow range of protected liberty interests,'" see Abbott v. McCotter, 13 F.3d 1439, 1442 (10th Cir. 1994) (quoting Hewitt v. Helms, 459 U.S. 460, 467 (1983)), and we do not believe Oxendine's claim that he was provided inadequate and delayed medical care falls within that "narrow range."

discretionary functions, see Anderson v. Creighton, 483 U.S. 635, 638 (1987), however, in cases where prisoners allege that inadequate or delayed medical care violated their Eighth Amendment rights, it has been established that "[p]rison officials violate the Eighth Amendment [only] when they are deliberately indifferent to the serious medical needs of prisoners in their custody." Perkins, 165 F.3d at 811 (citing Estelle, 429 U.S. at 104-06). Eighth Amendment claims alleging inadequate or delayed medical care thus involve both an objective and a subjective component, such that we must determine both "whether the deprivation is sufficiently serious" and "whether the [government] official acted with a sufficiently culpable state of mind." See id. at 809.

In regard to the objective element, a medical need is considered "sufficiently serious" if the condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (citations and quotations omitted). We note, however, that "[d]elay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000). As for the subjective element, we have stated that "a plaintiff must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable

measures to abate it.'"   Hunt, 199 F.3d at 1224 (quoting Farmer v. Brennan, 511

U.S. 825, 847 (1994)).  Whether the prison official had the requisite knowledge of

a substantial risk to an inmate's health or safety "is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial

evidence, and a factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious."  See Farmer, 511

U.S. at 842 (citation omitted).

Accordingly, for Oxendine to properly set forth an Eighth Amendment

claim on which relief may be granted, he must set forth facts demonstrating that

his alleged medical need, in this case the need for an outside medical specialist,

"was 'sufficiently serious' to meet the objective element of the deliberate

indifference test," Sealock, 218 F.3d at 1210, and that the Defendants' delay in

meeting that need caused him "substantial harm," see id..[7]  Finally, to meet the

---

[7] Defendants argue that Oxendine's claim is not truly a constitutionally cognizable claim that delay in receiving qualified medical care caused him substantial harm, but is instead based upon a mere disagreement with Dr. Kaplan regarding the appropriate time at which a specialist should have been brought in to examine Oxendine's reattached finger.  The government seems to find dispositive the fact that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care.  While it is true that "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation," Perkins, 165 F.3d at 811, we do not believe this case involves mere disagreement between the parties.  Accord Hunt, 199 F.3d at 1223-24 (holding that a prisoner's claim that he was denied adequate and timely medical assistance

(continued...)

subjective element of the deliberate indifference test, he must allege facts supporting an inference that Defendants knew about and disregarded a "substantial risk of harm" to his health or safety. See Hunt, 199 F.3d at 1224.

In his complaint, Oxendine states that, on March 14, 1999, after his fingertip was severed by his cell door, the guard on duty "rushed to the assigned room of inmate Oxendine and recovered the amputated portion of [Oxendine's] finger[,] which he promptly deposited in a container of ice for preservation." Oxendine was then taken to the infirmary, where officials paged Dr. Kaplan. Dr. Kaplan arrived approximately one hour later and, with the assistance of Jose Negron, surgically reattached the severed portion of Oxendine's finger to the remaining portion of Oxendine's finger. Oxendine was given Tylenol with codeine for the pain and sent back to his cell with instructions to return to the infirmary the next day. When Oxendine returned the next day, March 15, Dr. Kaplan examined and redressed the wound, noted in Oxendine's chart "tissue of reattached portion - viable", gave Oxendine more aspirin with codeine for the pain, and told Oxendine to "return to Health Services each successive day for the following two weeks."

---

[7](...continued)
did not reflect "mere disagreement with his medical treatment,"and that "the fact that he has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided").

According to the medical records attached to Oxendine's complaint, his finger was examined by a health care professional on the following dates: March 16, March 17, March 19, March 20, and March 22. On the first three of these days, Oxendine's medical chart reveals that prison health care professionals examined and redressed the wound, found the tissue to be viable, and told Oxendine to notify them if infection or other problems developed. On March 20, however, the notation reads, in part, "distal tip of finger black . . . [r]eturn Monday to see Dr. Kaplan for F/U." This notation is signed "J. Brown, EMTP." On March 22, Oxendine's medical chart includes a notation from Dr. Kaplan, stating "some distal necrosis of skin seen."[8] It thus appears that one health care professional who worked with Dr. Kaplan was aware that Oxendine's finger tissue was turning black as early as six (6) days after the injury, and that Dr. Kaplan was aware of the blackened and decaying tissue as early as eight (8) days after Oxendine's injury. Neither the March 20 notation nor the March 22 notation state that Oxendine was, or would be, referred to an outside medical specialist.[9]

---

[8] "Necrosis" is defined as the "death of living tissue: as . . . death of a portion of animal tissue differentially affected by loss of blood supply, corrosion, burning, the local lesion of a disease (as tuberculosis), or other local injury." See Webster's Third New International Dictionary 1511 (1986).

[9] The portion of Oxendine's medical chart that was attached to his complaint includes notations on unrelated health issues dated March 23, 1999, and March 24, 1999. The chart thus includes information for the two days following the initial observation of necrosis by Dr. Kaplan, and there is no

(continued...)

- 10 -

In his complaint, Oxendine alleged that he saw Dr. Kaplan for at least two weeks, or 14 days, after his injury (which would encompass the dates March 15 to March 29), and possibly for a much longer period of time, before Dr. Kaplan finally "sought out and acquired outside qualified medical help." Specifically, Oxendine stated that Dr. Kaplan insisted that the finger was healing properly and administered Tylenol for Oxendine's pain on March 15, as well as "on each subsequent visit by inmate Oxendine to Health Services for the next two weeks." "By this time," Oxendine alleged, "the reattached portion of the finger had turned jet-black . . . [and] on numerous occasions inmate Oxendine informed Dr. Kaplan that the amputated portion of the finger was gradually falling off from the remaining section of the finger." Oxendine further stated: "At that time and upon all following visits to Health Services, inmate Oxendine implored Dr. Kaplan to obtain a specialist in the field so that he would not lose that portion of his finger . . . . Dr. Kaplan repeatedly refused to send inmate Oxendine outside the institution to acquire a certified specialist and for a considerable period of time refused to bring into the institution same." Finally, alleged Oxendine, "after it was much too late to save the amputated portion of the finger, Dr. Kaplan sought

---

[9](...continued)
mention of referring Oxendine to an outside medical specialist for his severed finger on either of those days.

- 11 -

out and acquired outside qualified medical help. But, at that eleventh hour it was too late to save the portion because the majority of that had already fell off."

We have no doubt that Oxendine's severed finger, reattachment thereof, and subsequent worsening of the wound due to decaying tissue presented a serious medical need for purposes of the Eighth Amendment. The question, then, is whether Oxendine alleged facts sufficient to support a claim that Defendants exhibited "deliberate indifference" to that need.

Accepting, as we must, all factual allegations contained in Oxendine's complaint as true and construing those allegations in the light most favorable to Oxendine, see Breidenbach v. Bolish, 126 F.3d 1288, 1292 (10th Cir. 1997), it appears that Dr. Kaplan did not obtain outside medical assistance to treat Oxendine's injury until at least March 29, 1999, and quite possibly much later. This inaction by Dr. Kaplan occurred despite Oxendine's repeated reports of discomfort and blackening skin tissue on his reattached finger, and despite signs recorded by health care personnel and by Dr. Kaplan himself, of which Dr. Kaplan was unquestionably aware no later than March 22, 1999, of necrosis of the distal skin tissue on Oxendine's reattached finger.

Assuming these facts are true, the alleged delay in obtaining specialized medical treatment meets the objective element of the deliberate indifference test. The ineffectiveness of Dr. Kaplan's reattachment and subsequent care of the

severed finger, as evidenced by the blackening and necrifying tissue, was "sufficiently serious" because it was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See Hunt, 199 F.3d at 1224. In addition, the delay in seeking specialized treatment apparently caused Oxendine substantial harm due to the fact that a specialist was not obtained until after a substantial portion of the reattached finger had already been lost to decay, and because Oxendine experienced considerable pain while the finger continued to rot. See Hunt, 199 F.3d at 1224 (stating that officials may be "held liable when [a] delay results in a lifelong handicap or a permanent loss"); Sealock, 218 F.3d at 1210 ("The pain and suffering imposed by Barrett's failure to get him treatment lasted several hours. . . . Certainly, not every twinge of pain suffered as a result of delay in medical care is actionable. The evidence in this case, however, establishes the objective element of the deliberate indifference test.").

In regard to the subjective portion of the deliberate indifference test, we find that Oxendine has alleged facts supporting an inference that Dr. Kaplan knew about and disregarded a substantial risk to Oxendine's health. The complaint and attached documents demonstrate: (1) Dr. Kaplan acknowledged the delicate nature of the operation and follow-up care of Oxendine's finger by requiring daily visits by Oxendine to the infirmary; (2) Oxendine repeatedly informed Dr. Kaplan that his finger "had turned jet black," "that the amputated portion was gradually

falling off from the remaining section of the finger," and that he was in considerable pain due to the decaying skin tissue; (3) decaying tissue appeared as early as March 20, 1999, and Dr. Kaplan himself recorded evidence of gangrenous tissue on March 22, 1999; and (4) Dr. Kaplan did not seek specialized medical assistance to deal with Oxendine's decaying finger until at least March 29, 1999, and quite possibly much later. Given these alleged facts, we find that Oxendine has made sufficient allegations to satisfy the subjective element of the deliberate indifference test for purposes of defeating a Rule 12(b)(6) motion. Accord Sealock, 218 F.3d at 1211 (noting that one type of deliberate indifference is evidenced "when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment") (emphasis added).

In addition, Oxendine alleged that Dr. Kaplan, assisted by Jose Negron, was not qualified to perform this particular surgery, but nevertheless performed the operation without seeking assistance from a specialized, qualified surgeon who would be capable of successfully reattaching Oxendine's finger. Again, taking Oxendine's allegations as true, we cannot say he has failed to state a claim upon which relief may be granted based upon the deliberate indifference of Dr. Kaplan and Jose Negron to Oxendine's serious medical needs.

- 14 -

This is not to say that Oxendine will prevail on his claim once the Defendants are given an opportunity to clarify and explain their actions in regard to Oxendine's medical treatment. But we are tasked with deciding only whether Oxendine has alleged sufficient facts to support a claim that he was denied adequate and timely medical care in violation of the Eighth Amendment, such that it would be improper to dismiss the complaint pursuant to Rule 12(b)(6). For the foregoing reasons, we find that he has done so. Accordingly, we REVERSE the decision of the district court and REMAND for further proceedings not inconsistent with this opinion.