SEYMOUR, J.,
dissenting as to defendant Quintana.
Because I disagree with the majority’s legal analysis and conclusion regarding defendant Quintana, I respectfully dissent. As explained above, on the morning of October 30, Ms. Mata returned to the infirmary as directed by Ms. Weldon, with continuing complaints of severe chest pain. Ms. Mata informed Ms. Quintana, the nurse on duty, that she had been suffering from severe chest pain since the evening of October 29, and that her pain registered an “eight” in severity on a scale of zero to ten. Ms. Quintana administered an EKG, which the machine printout “read” as normal. She then provided Ms. Mata with a “lay-in,” or permission slip, excusing her from work and other prison duties for the duration of the day.[1]
The district court granted summary judgment for Ms. Quintana, holding that deliberate indifference requires more than a showing of failure to provide the proper standard of care. I would reverse that decision.- While it is true that “a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation,” Perkins v. Kansas Dep’t of Corrs., 165 F.3d 803, 811 (10th Cir.1999) (citations omitted), this is not a case of mere disagreement between the parties. See Oxendine v. Kaplan, 241 F.3d 1272, 1277 n. 7 (10th Cir.2001); accord Hunt v. Uphoff, 199 F.3d 1220, 1223-24 (10th Cir.1999) (prisoner’s claim he was denied adequate and timely medical assistance does not reflect “mere disagreement with his medical treatment” and “the fact that he has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, ie., that treatment was prescribed at all or that prescribed treatment was provided”). Ms. Mata’s argument is not that Ms. Quintana was negligent or committed medical malpractice, but rather that she recklessly deviated from acceptable medical norms by denying her “access to medical personnel capable of evaluating the need for treatment.” Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir.2000); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980); see also note 2 supra (opinion of Seymour, J.). Ms. Mata has proffered facts supporting an inference that Ms. Quintana knew about and disregarded a substantial risk to Ms. Mata’s health.
*762 Ms. Mata’s evidence demonstrates that: she informed Ms. Quintana she was suffering severe chest pains; Ms. Quintana performed an EKG because she knew severe chest pains were a cardiac symptom; as an LPN, Ms. Quintana was not qualified to read an EKG;[2] a “normal” EKG does not necessarily rule out an impending heart attack;[3] well-established standards of nursing care and the DOC protocols require that a person suffering from chest pain have an official EKG reading and on-site medical evaluation performed by either a physician, physician assistant, or nurse practitioner; Ms. Quintana acknowledged in her deposition testimony that under the DOC protocols she is supposed to call a physician in cases of severe chest pain, AplLApp. at 197-98; and Ms. Quinta- *763 na failed to seek the appropriate specialized medical assistance that Ms. Mata’s condition demanded. This evidence is sufficient to satisfy the subjective element of the deliberate indifference test for purposes of defeating a motion for summary-judgment.
Ms. Quintana, like Ms. Weldon, contends that granting summary judgment in her favor was appropriate because she is similarly situated to defendant Huber for whom summary judgment was affirmed in Sealock. But there are critical differences between Ms. Quintana and defendant Huber. First, while there was no evidence in Sealock that defendant Huber knew unexplained chest pain posed a serious medical risk, there is evidence here that Ms. Quin-tana was subjectively aware of the seriousness of chest pain. According to the court in Sealock, “Huber stated ... that she did not consider the chest pain to be a cardiac symptom”; rather, she believed the defendant had contracted the flu. Sealock, 218 F.3d at 1208, 1212 n. 7. “Thus ... she at most made a misdiagnosis.” Id. at 1212 n. 7. Unsurprisingly, Ms. Quintana makes no such claim in this case. She conceded in her deposition testimony that she is familiar with the DOC protocol for chest pain, ApliApp. at 197-98, which describes chest pain as a potential symptom of “acute cardiac disease.” Id. at 201-02. In addition, if she did not believe chest pains were a cardiac symptom, there would have been no plausible reason to perform an EKG.
Second, Ms. Quintana acknowledged that the DOC protocols required her to seek specialized medical treatment for Ms. Mata under the circumstances, while no such evidence was presented in Sealock concerning defendant Huber’s subjective knowledge of proper medical procedures. We gave no indication in Sealock that protocols were introduced as circumstantial evidence of defendant Huber’s knowledge that chest pains are a serious cardiac symptom. The events at issue in Sealock appear to have transpired before publication of the DOC protocols that pertain to this case.
Finally, while the evidence suggests Ms. Quintana recklessly abdicated her duty as a gatekeeper by refusing to contact anyone qualified to assess Ms. Mata, defendant Huber in Sealock actually did refer the prisoner to a physician assistant within two hours of the prisoner’s complaints of chest pain. Sealock, 218 F.3d at 1208. In sum, Ms. Mata presented evidence that Ms. Quintana was aware of the severity of her chest pain and knew that such pain posed a serious risk to Ms. Mata’s health. “Failure to summon [qualified medical personnel or] an ambulance would have disregarded that risk, arguably constituting deliberate indifference to a serious medical need.” Id. at 1211-12.
For the aforestated reasons, I dissent from the majority’s decision to affirm the district court’s dismissal of Ms. Mata’s claim with regard to defendant Quintana.

. Ms. Quintana contends, and the district court accepted as true, that she also instructed Ms. Mata to return to the infirmary if her . pain persisted. This fact, however, is controverted. When queried directly in her deposition, Ms. Mata responded that Ms. Quintana had never advised her to return for treatment should her pain persist. Aplt.App. at 110. In reviewing the district court's grant of summary judgment, we are obligated to view the facts in the light most favorable to Ms. Mata.

. The "Most Frequently Asked Scope of Practice Q & A's” provided by the Colorado Department of Regulatoiy Agencies states:
The placing of leads and performing an EKG is within the scope of practice of an LPN, however, reading or interpreting the results of an EKG are not within the scope of an LPN. CRS 12—38—117(l)(c) gives the Board statutory authority to discipline any nurse upon evidence that the person has willfully or negligently acted in a manner inconsistent with the health or safety of a person under his care.
Aplt.App. at 221 (emphasis added). See also Aplt.App. at 255 (Aff. of McCall) ("Under no recognized standard of nursing practice, anywhere, is an L.P.N. ever authorized to [interpret an EKG].”); id. at 247 (Aff. of Menden-hall) (same).

. Not all serious heart conditions are detected by an EKG, also known as an ECG:
The electrocardiogram is essentially a screening test. It gives us a piece of the whole cardiac picture, but only occasionally—as in an acute heart attack or rhythm disturbance—the definitive piece. Like all tests, it has limitations and pitfalls. It must be interpreted within the context of these, which requires, expertise and experience.
Some heart problems may go undetected by the ECG. Someone who has had a prior heart attack may develop a normal electrocardiogram over time. Some parts of the heart may not be electrically visible on the ECG; even during an acute heart attack, an ECG may appear normal. Many people ask about their ECG, perhaps under the impression that a normal ECG means a healthy heart, but a nonnal ECG can hide a heart problem, just as apparent abnormalities may simply indicate variations of normal. With an ECG, shades of grey are common; it is like viewing scenery without your eyeglasses.
Rob Myers, MD, Heart Disease: Everything You Need to Know 41 (2004) (emphasis added).
Like any other test result, ECG results are not always 100 percent accurate. Some rhythm disorders are so complex that they can’t be diagnosed with certainty without further testing. The ECG may occasionally suggest coronary artery disease when other testing shows no coronary artery disease. The ECG may appear normal when you do have such disease—particularly if you aren't showing any symptoms when you have the ECG.... One of the problems with traditional ECGs is that because they are performed over only a minute or so, some sporadic rhythm abnormalities or other problems may be missed.
Mayo Clinic Heart Book: The Ultimate Guide to Heart Health 240 (Bernard J. Gersh, ed., 2d ed.2000) (emphasis added); see also J. Willis Hurst, Interpreting Electrocardiograms: Using Basic Principles and Vector Concepts 98 (2001) ("The clinician must ... know the limitation[s] of the [EKG]. For example, the clinician must know the types of heart disease that can be present when the electrocardiogram is normal.") (emphasis added).
The fact that patients with a normal EKG reading sometimes suffer from serious heart problems explains the rationale for (1) the regulation prohibiting LPNs from reading or interpreting the results of an EKG/ECG and (2) the protocol requiring LPNs to immediately send patients who are experiencing severe chest pain or angina to a "heatlh care provider,” i.e., a physician, physician assistant or a nurse practitioner, for a medical evaluation. Aplt.App. at 221 (“reading or interpreting the results of an EKG are not within the scope of an LPN”); id. at 200-02 ("patients presenting for evaluation of chest pain ... [w]ill be evaluated onsite by either the [health care] provider on site or the on-call mid-level [health care] provider").