**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 31, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEPHEN THENE SPARKS,

    Plaintiff - Appellant,

v.

TEJINDER SINGH; TED LAURENCE,

    Defendants - Appellees.

No. 16-1290
(D.C. No. 1:12-CV-01897-RM-MJW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

    Stephen Thene Sparks, a Colorado inmate, appeals the district court's grant of summary judgment to physician assistants Tejinder Singh and Ted Laurence on his claim that they violated his Eighth Amendment rights by failing to diagnose and treat his diabetes. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's judgment.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. BACKGROUND

### A. *Diagnostic Standards*

According to the American Diabetes Association (ADA), "Type 2 diabetes is frequently not diagnosed until complications appear, and approximately one-third of all people with diabetes may be undiagnosed." Aplt. App., Vol. 1 at 119. Since 2006, the ADA has used three diagnostic criteria. First, a patient can be diagnosed with diabetes if he or she exhibits symptoms such as polyuria, polydipsia, and unexplained weight loss, coupled with a casual plasma glucose greater than or equal to 200 mg/dl (milligrams per deciliter).[1] Second, diabetes can be diagnosed using a "fasting plasma glucose (FPG)" test, the preferred diagnostic test. *Id.* at 118. An FPG of 100 to 125 mg/dl suggests a form of "pre-diabetes" called "impaired fasting glucose" (IFG), while an FPG of 126 mg/dl or greater is sufficient to diagnose diabetes itself. *Id.* (internal quotation marks omitted). Third, diabetes can be diagnosed if a patient has a two-hour plasma glucose greater than or equal to 200 mg/dl during an oral glucose tolerance test. *See id.*; *see also id.* at 142, 144.

The ADA states that "[p]atients with IFG should be given counseling on weight loss [and] instruction for increasing physical activity" to prevent or delay the onset of diabetes. *Id.* at 120. The ADA also emphasizes the importance of follow-up counseling and monitoring for diabetes every one to two years, with close attention paid to cardiovascular risk factors. *See id.*

---

[1] "Casual is defined as any time of day without regard to time since last meal." Aplt. App., Vol. 1 at 118.

In 2010, the ADA expanded the criteria for detecting impaired glucose and diabetes by adding the hemoglobin A1c (A1C) test. *See id.* at 144. According to the ADA, in general terms, the A1C test measures the percentage of hemoglobin that is glycated—has a glucose molecule attached to it. *See* American Diabetes Ass'n, *Diabetes Forecast* (June 2010), https://perma.cc/C9HC-YFCB.[2] An A1C between 5.7% and 6.4% satisfies the criteria for impaired glucose, while an A1C greater than or equal to 6.5% is adequate to diagnose diabetes. Aplt. App., Vol. 1 at 144. According to the ADA's 2010 guidelines, patients with IFG are at high risk for developing diabetes and cardiovascular disease, and thus "individuals with an A1C of 5.7% - 6.4% should be informed of their increased risk for diabetes as well as [cardiovascular disease] and counseled about effective strategies to lower their risks . . . ." *Id.* Through 2010, the Colorado Department of Corrections (CDOC) followed the ADA guidelines for diagnosing IFG and diabetes using FPG levels, but CDOC did not employ the A1C test until sometime after April 2011, *see id.* at 139; Aplee. Br. at 10.

### B. *Mr. Sparks' Condition and Treatment*

1. **Test results—2006-2010**

Mr. Sparks first had his blood tested on August 17, 2006, when he was an inmate at CDOC's Limon Correctional Facility. His FPG at the time was 104 mg/dl, which classified him as IFG. Aplt. App., Vol. 1 at 116. On February 14, 2007, a

---

[2] The Perma.cc link archives the referenced webpage.

blood test showed his FPG had risen to 109 mg/dl. *Id.* at 122. A September 5, 2007 blood test showed his FPG rose again to 123 mg/dl, near the top of the IFG range. *Id.* at 191. The record does not reflect that Mr. Sparks had any blood tests between September 2007 and April 2010, but on April 28, 2010, a blood test revealed a *non-fasting* glucose level of 177 mg/dl, *id.* at 137. Additional blood work done on August 16, 2010 showed Mr. Sparks' FPG had fallen to 103 mg/dl, *id.* at 145, though his A1C was 7.0%—high enough to diagnose him with diabetes under the newly expanded ADA diagnostic guidelines, *id.* at 146. Despite this information, Mr. Sparks testified he was not informed or counselled about his impaired glucose level.

2. **Mr. Sparks and Mr. Singh—September 2010**

In September 2010, Mr. Sparks was transferred to CDOC's Arkansas Valley Correctional Facility. As part of the routine intake process, Mr. Singh, a physician assistant (PA), reviewed Mr. Sparks' medical records—he did not actually see Mr. Sparks—and noted the results of his most recent blood work: an FPG of 103 mg/dl and a 7% A1C. Although Mr. Singh knew the diagnostic standards for impaired glucose and diabetes, *see id.*, Vol. 2 at 236, and circled Mr. Sparks' IFG of 103 mg/dl, *see id.*, Vol. 1 at 145, Vol. 2 at 245, he did not refer Mr. Sparks to the chronic care clinic. He reasoned that Mr. Sparks had not been diagnosed with a qualifying condition, such as hypertension, diabetes, or hepatitis C, and impaired glucose was not an acute or chronic condition.

Moreover, Mr. Singh stated at his deposition, based on notes in the medical records, that Mr. Sparks had been educated about his glucose impairment and the need for a proper diet and exercise by his medical provider at Limon, Gisela Walker. He said Ms. Walker had counseled Mr. Sparks about his elevated glucose levels "[m]aybe four or five times." *Id.* at 237. He cited six ambulatory notes from 2006 through 2008, which purport to show that Ms. Walker counseled Mr. Sparks on his impaired glucose levels, *see id.*, Vol. 1 at 187-92. Mr. Singh testified that he had recently accessed Mr. Sparks' medical records and discovered the notes. *See id.*, Vol. 2 at 237-38 (depo. at 48-49, lines 10-3). He indicated he had no independent knowledge whether Mr. Sparks was counselled, *see id.* at 240 (depo. at 59-60, lines 20-9), and conceded his testimony was based on the six ambulatory notes, which he could not recall reviewing when he processed Mr. Sparks' intake, *see id.* at 244 (depo. at 73, lines 4-6). Nevertheless, Mr. Singh stated that he had reviewed the entire chart during the September 2010 intake and the records were part of the chart. *Id.* at 240 (depo. at 59-60, lines 25-5).

3. **Mr. Sparks and Mr. Laurence—April 2011**

In April 2011, Mr. Sparks went to the prison's medical clinic for leg pain. He was evaluated by another PA, Mr. Laurence, who sent him to the hospital for treatment of deep vein thrombosis. Blood tests at the hospital indicated his A1C had risen to 8.5%, and a hospital discharge note listed controlled diabetes among the "[d]ischarge [d]iagnoses," *id.*, Vol. 1 at 186. Also, the note stated, "Probably has new onset [diabetes] which may have contributed by [sic] relative dehydration." *Id.*

Mr. Sparks was discharged from the hospital to a CDOC infirmary located at another facility called "Territorial," *id.*, Vol. 2 at 332. An infirmary provider received a call from a hospital physician, Dr. Drake. According to an infirmary note, Dr. Drake told the provider that Mr. Sparks' A1C was 8% and he had a questionable history of diabetes, which Mr. Sparks apparently confirmed. *See id.*, Vol. 1 at 184.

When Mr. Sparks returned to Arkansas Valley later in April 2011, Mr. Laurence did not treat him for either diabetes or impaired glucose, despite the information contained in the hospital records and the infirmary note. Mr. Laurence acknowledged during his deposition that he would have reviewed the infirmary note when Mr. Sparks returned to Arkansas Valley, but when presented with the infirmary note, he said it reflected only a *questionable* history of diabetes. *See id.*, Vol. 2 at 333 (depo. at 82, lines 4-7). He then denied seeing any documentation indicating that Mr. Sparks was actually diagnosed with diabetes. *Id.* (depo. at 82, lines 15-23). Further, he explained, "I usually review the infirmary notes if they're in the chart," *id.* at 334 (depo. at 87, lines 16-19), and it was "common practice" to review inmates' infirmary notes when they return from the hospital, *id.* at 335 (depo. at 89, lines 17-20). But he said he probably would not have prescribed medication if the infirmary had not started any medication. *See id.* at 334 (depo. at 87, lines 22-24). He also clarified that the lab reports from the hospital "may have been in the chart when [Mr. Sparks] returned, but [he] did not remember seeing the documentation." *Id.* at 334 (depo. at 87, lines 1-3). He admitted that it would have been important to

be aware of this type of record and that he would have started Mr. Sparks on medication if had he seen the lab report from the hospital.

4. **Mr. Sparks' February 2012 Complications and Treatment**

In February 2012, Mr. Sparks became acutely ill. On February 1, he went to the medical clinic, reporting an emergency. He described symptoms of frequent, darkly colored urination, a sore throat and mouth, fever, chills, trouble sleeping and eating, coughing with yellow and green sputum, and a burning sensation in his chest. Also, his gums and throat were red with white patches. After an evaluation, a nurse gave Mr. Sparks ibuprofen and instructions to return to the clinic if his symptoms worsened. Mr. Singh also prescribed an antibiotic, though he did not evaluate Mr. Sparks that day.

The next day, Mr. Sparks returned to the clinic reporting no improvement. He said he had been up all night, nauseous and vomiting. He had a low-grade fever, enlarged cervical nodes, and no improvement to the sores in his mouth, gums, and throat. Mr. Singh diagnosed pharyngitis, prescribed Omerprazole, continued the antibiotics, and ordered an additional injection of antibiotics. He also instructed Mr. Sparks to drink more water to maintain proper hydration and to sleep with his head elevated to reduce the symptoms of acid reflux.

On February 4, 2012, Mr. Sparks again returned to the clinic. This time he said he could not swallow, his tongue was swollen, he was having trouble breathing, and he was vomiting "acid." *Id.*, Vol. 1 at 209. He reported eating almost nothing in the past couple of days, not even water. A nurse examined Mr. Sparks and noted his

lips and cheeks appeared swollen, he had a white film on the inside of his mouth and on his tongue, and he had papules on his hands. The nurse consulted with Mr. Laurence, who was on-call. Mr. Laurence ordered a urinalysis, which revealed abnormal amounts of ketones and sugar in Mr. Sparks' urine. Additionally, his non-fasting blood glucose was 396 mg/dl. Based on this information, Mr. Laurence directed the nurse to administer fluids and insulin, which dropped Mr. Sparks' glucose to 296 mg/dl. Once Mr. Sparks was stable, Mr. Laurence transferred him to the hospital, where doctors diagnosed him with diabetes.

## C. *Procedural History*

Based on these events, Mr. Sparks filed a pro se complaint under 42 U.S.C. § 1983, alleging Mr. Singh and Mr. Laurence violated his Eighth Amendment rights by failing to diagnose and treat his diabetes.[3] Mr. Singh and Mr. Laurence moved for summary judgment, and through counsel, Mr. Sparks filed a response in opposition.

Mr. Sparks argued that Mr. Singh was deliberately indifferent to his serious medical needs by failing to refer him to the chronic care clinic upon transfer to Arkansas Valley. He insisted Mr. Singh knew he had impaired glucose levels and also knew the attendant risks of it progressing to diabetes, and yet he did nothing.

Mr. Sparks alleged that Mr. Laurence failed to treat him for diabetes after he was discharged from the hospital in April 2011. Citing Mr. Laurence's testimony

---

[3] Mr. Sparks named additional defendants, all of whom were dismissed by the district court and are not parties to this appeal.

that he would have reviewed the infirmary records reflecting an 8% A1C and a questionable history of diabetes, Mr. Sparks claimed Mr. Laurence disregarded a substantial risk of harm by failing to begin treatment when he returned to Arkansas Valley.

The district court rejected these arguments and granted summary judgment to Mr. Singh and Mr. Laurence.[4] This appeal followed.

## II. **DISCUSSION**

### A. *Standard of Review and Legal Background*

"We review the district court's grant of summary judgment de novo, applying the same legal standards the district court applied under Federal Rule of Civil Procedure 56(a)." *Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017). "'The [c]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A fact is material if it could "affect the outcome of the suit"; a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "At the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

---

[4] The district court noted that defendants raised qualified immunity as a defense, but the court did not analyze the issue. Defendants have not addressed qualified immunity on appeal, and we do not consider it.

"A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "'Deliberate indifference' involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "The objective component is met if the deprivation is 'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The parties do not dispute that impaired glucose and diabetes are sufficiently serious medical conditions that satisfy the objective component. Thus, we do not consider the objective component and evaluate only the subjective component, careful to maintain the critical distinction between the two. *See Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006) (analyzing only the subjective component where the parties agreed the objective component was met).

The subjective component of a deliberate indifference claim "requires the plaintiff to present evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. An official will not be liable unless he "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Self,* 439 F.3d at 1231 (quoting *Farmer*, 511 U.S. at 837). But an official may be liable if he knew the prisoner "faced a substantial risk of harm and disregarded that risk 'by failing to take reasonable measures to abate it.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847).

- 10 -

We have explained that "[t]he deliberate indifference standard lies somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Mata*, 427 F.3d at 752 (internal quotation marks omitted). The deliberate indifference standard poses "a high evidentiary hurdle" "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self*, 439 F.3d at 1231, 1232 (internal quotation marks omitted).

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. This is so because if a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it.

*Mata*, 427 F.3d at 752 (brackets, citation, and internal quotation marks omitted).

"[T]he subjective component is not satisfied, [however,] absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232. Indeed, the Eighth Amendment is not infringed "when a doctor simply resolves the question whether additional diagnostic techniques or forms of treatment is indicated." *Id.* (internal quotation marks omitted). Thus, in the context of a missed diagnosis or delayed referral, there must be direct or circumstantial evidence that "the need for additional treatment or referral to a medical specialist is obvious." *Id.* "The fact that a serious medical need was 'obvious' could be evidence of deliberate indifference," *id.* at 1231, such as where "a

- 11 -

medical professional fails to treat a medical condition so obvious that even a layman would recognize the [need for additional treatment]," *id.* at 1232.

Our cases recognize two ways in which the subjective component may be shown. "First, a medical professional may fail to treat a serious medical condition properly," and second, a prison official may act as a gatekeeper and "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. In either case, the "inadvertent failure to provide adequate medical care" tantamount to negligence does not satisfy the deliberate indifference standard. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

B. *Analysis*

1. **Mr. Singh**

Mr. Sparks' claim against Mr. Singh is premised on a gatekeeper theory. He argues that Mr. Singh failed to refer him to the chronic care clinic upon admission to Arkansas Valley in September 2010, despite knowing he had impaired glucose levels. Specifically, Mr. Sparks contends that Mr. Singh reviewed his chart, recognized his most recent lab results from August 2010 reflected an IFG of 103 mg/dl and an A1C of 7%, and yet Mr. Singh did nothing. Implicit in this argument is that the chronic care clinic could have counselled Mr. Sparks on the benefits of a proper diet and exercise to delay or prevent the onset of diabetes. Mr. Sparks contends that Mr. Singh consciously disregarded the risks of his IFG and diabetes by failing to ensure he was counselled, despite knowing those risks.

- 12 -

The district court rejected this argument, ruling that "[t]he possibility that plaintiff's impaired glucose levels *could* progress to a diabetic condition that *would* then require referral to the chronic care clinic is insufficient to support allegations of reckless disregard by Singh." Aplt. App., Vol. 1 at 30.

This reasoning, however, does not distinguish the objective and subjective components of the deliberate indifference test. The parties agree that impaired glucose is itself an objectively serious condition. "The Eighth Amendment also protects against future harm to an inmate." *Hunt*, 199 F.3d at 1224. The question, therefore, is not whether Mr. Sparks' impaired glucose would progress to diabetes. It is whether Mr. Singh, despite knowing about Mr. Sparks' impaired glucose levels when he reviewed Mr. Sparks' chart in September 2010, disregarded his known risk factors of developing diabetes by failing to ensure he was counselled on his impaired glucose and the benefits of a proper diet and exercise.

On this score, Mr. Singh testified, based on the notes, that Ms. Walker educated Mr. Sparks on the importance of a proper diet and exercise when Mr. Sparks was incarcerated at Limon. He said she counselled Mr. Sparks repeatedly over several years and took his family history, including his mother's diagnosis of diabetes. Aplt. App., Vol. 2 at 235. Although Mr. Singh had no independent knowledge of whether Mr. Sparks had actually been counselled and conceded that his testimony was based on the six ambulatory notes recorded by Ms. Walker, *see id.* at 243-44 (depo. at 72-73, lines 23-6), he also said these ambulatory notes were in

Mr. Sparks' medical chart and he reviewed the entire chart, *see id.* at 240 (depo. at 59-60, lines 20-5).

This testimony precludes finding deliberate indifference because Mr. Singh would have seen the ambulatory notes reflecting Mr. Sparks' counselling at the time of intake, even if Mr. Singh could not remember those notes by the time he was deposed. Mr. Sparks fails to create a factual dispute by citing his testimony that CDOC never counselled him on his impaired glucose because it has no bearing on Mr. Singh's state of mind when he reviewed Mr. Sparks' medical chart and saw records purporting to show that Mr. Sparks had been counselled. *Cf. Mata*, 427 F.3d at 756 (holding that prison official's state of mind is evaluated at the time treatment is denied, regardless of whether the inmate *subsequently* received care by other personnel). Consequently, Mr. Singh was entitled to summary judgment.

2. **Mr. Laurence**

Mr. Sparks claims that Mr. Laurence failed to diagnose and begin treating his condition in April 2011 when he returned to Arkansas Valley from the infirmary following his hospital discharge.[5] Mr. Sparks cites his hospital records, which reflected an 8.5% A1C, and the infirmary note, which reported a questionable history of diabetes, and says Mr. Laurence was deliberately indifferent in failing to treat him for diabetes despite having reviewed these records. Mr. Laurence denied having reviewed the hospital records, but he does not dispute that he had reviewed the

_____

[5] Mr. Laurence was consulted by the nurse who evaluated Mr. Sparks in February 2012, but Mr. Sparks' claim is not predicated on that interaction.

infirmary note.  *See* Aplee. Br. at 29 ("P.A. Laurence's review focused on records concerning the medical condition for which he had sent Mr. Sparks to the hospital . . . .  Those records included a chart entry summarizing a call from a hospital doctor to a medical provider at the CDOC's infirmary.").  He contends, however, that he was not deliberately indifferent because neither the hospital physician nor the infirmary provider actually diagnosed diabetes or prescribed medication.

The district court accepted this argument and concluded that Mr. Laurence had provided a level of care consistent with Mr. Sparks' symptoms.  The court reasoned that during interactions with Mr. Sparks both in April 2011 and February 2012, Mr. Laurence triaged the urgent condition, stabilized Mr. Sparks, and sent him to the hospital for treatment.

This analysis does not directly address Mr. Sparks' claim, which is not predicated on how Mr. Laurence treated him on these two occasions.  And the fact that other medical providers failed to prescribe medication at that time does not resolve the claim against Mr. Laurence.  Mr. Sparks' claim is that Mr. Laurence knew of and disregarded a substantial risk of harm when Mr. Sparks returned from the infirmary following his hospitalization in April 2011.  We must therefore examine what Mr. Laurence reviewed and knew at that time.

Initially, when asked at his deposition whether he would have reviewed the hospital records, Mr. Laurence said, "Maybe."  Aplt. App., Vol. 2 at 333 (depo. at 81, line 6).  He was more direct when asked whether he would have reviewed the

- 15 -

infirmary records, stating, "Yes, sir." *Id.* (depo. at 81, line 10). But when presented with the actual infirmary note, Mr. Laurence said it showed only a *questionable* history of diabetes, and he denied "review[ing] any sort of documentation that showed that Mr. Sparks had been diagnosed with diabetes when he returned to" Arkansas Valley. *Id.* (depo. at 82, lines 16-18). He also denied receiving a copy of the hospital discharge note and said he was not given any indication of the potential new diagnosis when Mr. Sparks returned from the infirmary. *See id.* at 334 (depo. at 86, lines 10-24).

Mr. Laurence clarified, however, that the lab report in the hospital records showing the 8.5% A1C may have been in the chart but he could not remember seeing it. *Id.* (depo. at 87, lines 1-3). Further, he testified, "I would have reviewed the infirmary notes. I do not remember reviewing that entry." *Id.* at 335 (depo. at 89-90, lines 25-1). Also, he said the infirmary note may have been included in Mr. Sparks' medical chart when he returned from the infirmary, but he could not recall seeing it. He explained the documents are typically in chronological order in the medical chart and sometimes "[i]t's easy to miss some of th[e] encounters due to the location in the chart." *Id.* (depo. at 91, lines 6-9).

a. *Hospital records*

Mr. Laurence's testimony reflects that he did not see, or did not remember seeing, the hospital records. Although his failure to review those records may have been negligent, such negligence is insufficient to satisfy the deliberate indifference standard. *See Sealock*, 218 F.3d at 1211 (recognizing that a medical professional

- 16 -

may claim as a defense that he was only negligent in diagnosing or treating a medical condition).[6]

b. *Infirmary note*

The next question is whether Mr. Laurence was deliberately indifferent in April 2011 by failing to act on the information in the infirmary note. Mr. Laurence does not dispute he reviewed the infirmary note, which contained the following shorthand reference to a questionable history of diabetes: "Dr. Drake said pt.'s A1C was 8, w/ ?h-o D.M." Aplt. App., Vol. 1 at 184.

Mr. Laurence testified that he would not have been concerned with the 8% A1C because CDOC was not using the A1C test to diagnose diabetes at the time. *See id.*, Vol. 2 at 335-36 (depo. at 92-93, lines 20-4). Indeed, he repeatedly said A1C results were immaterial or unimportant because CDOC was not using it to diagnose diabetes. *See id.* at 330 (depo. at 69, lines 5-6); *id.* at 336 (depo. at 93, lines 3-4). In light of CDOC's exclusion of the A1C test, Mr. Laurence's testimony demonstrates that he did not subjectively believe the A1C results manifested a substantial risk of harm.

---

[6] We note a significant distinction between this case and *Sealock*, where a defendant PA candidly admitted that he would have summonsed an ambulance for an inmate experiencing unexplained chest pain if he had known about the inmate's chest pain. 218 F.3d at 1211-12. We reversed the grant of summary judgment in favor of the PA because there was conflicting evidence as to whether he did, in fact, know about the inmate's chest pain. *Id.* at 1212. Here, Mr. Laurence similarly acknowledged that if he had seen the hospital lab reports, he would have said Mr. Sparks was diabetic and begun treating him for diabetes. *See* Aplt. App., Vol. 2 at 334, 336. But unlike *Sealock*, there is no evidence controverting Mr. Laurence's testimony that he did not see the hospital lab reports.

- 17 -

Regarding the infirmary note's comment that Mr. Sparks had a questionable history of diabetes, we must ascertain whether it presented an obvious need for treatment or a medical judgment to begin treatment. A medical professional's failure to treat a medical condition so obvious that even a layperson would understand the need for additional or specialized treatment could support an inference of deliberate indifference. *See, e.g., Oxendine v. Kaplan*, 241 F.3d 1272, 1279 (10th Cir. 2001) (reversing dismissal for failure to state a claim where the complaint alleged a prison physician reattached an inmate's severed portion of finger and denied specialized follow-up care despite knowing that amputated portion of finger was decaying, had turned "jet black," and was gradually falling off (internal quotation marks omitted)).[7] The reference to Mr. Sparks' questionable history of diabetes did not manifest an obvious need for treatment. Although it put Mr. Laurence on notice of a *potential* risk, our legal standard requires an *obvious* risk to create an inference of deliberate indifference. *See Mata*, 427 F.3d at 752 ("[I]f a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." (brackets and internal quotation marks omitted)).

Absent an obvious risk, the need for additional treatment usually is a question of medical judgment, which is not a predicate for deliberate indifference. *See Self*,

---

[7] Obviousness may also arise in two other contexts that do not apply here— *viz.*, when (1) "a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral" and (2) "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency." *Self*, 439 F.3d at 1232.

439 F.3d at 1232 ("Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing."). Mr. Laurence could still possibly be liable if he had recognized a substantial risk of harm and yet failed to confirm whether Mr. Sparks needed treatment. *See Mata*, 427 F.3d at 752 ("An official would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." (internal quotation marks omitted)). But the record shows that did not happen here.

The infirmary note's cursory reference to a questionable history of diabetes was not a confirmed diagnosis requiring treatment. Nor did it manifest a clear directive for treatment such that a reasonable jury could infer that Mr. Laurence was deliberately indifferent. *Cf. Erickson v. Pardus*, 551 U.S. 89, 90, 94 (2007) (reversing dismissal for failure to state a claim of deliberate indifference where complaint alleged prison officials diagnosed inmate as requiring treatment for hepatitis C, removed him from his prescribed medication, and refused to provide treatment). And the infirmary note's reference to a *questionable history* of diabetes did not raise such a strong inference of *actual*, *present* risk that Mr. Laurence must have suspected a potential need for treatment warranting definitive confirmation or disconfirmation. *See Mata*, 427 F.3d at 752. Without such evidence, the decision whether to treat Mr. Sparks based on a questionable history of diabetes would have

- 19 -

been a question of medical judgment, which does not support an inference of deliberate indifference here.[8]

In sum, the infirmary note's reference to a questionable history of diabetes did not signal a need for treatment so obvious that even a layperson would recognize it. The law requires a level of obviousness that did not exist here, and the record shows Mr. Laurence's subjective understanding of whether to treat Mr. Sparks was within the realm of medical judgment. Mr. Laurence was entitled to summary judgment.

### III.  CONCLUSION

The judgment of the district court is affirmed.


ENTERED FOR THE COURT,


Scott M. Matheson, Jr.
Circuit Judge

---

[8] If there had been a definitive diagnosis of diabetes, Mr. Laurence's testimony is that a medical response would have been proper and he would have exercised his medical judgment to determine an appropriate response.  *See* Aplt. App., Vol. 2 at 334, 336.